689 A.2d 1351

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. LYLE NANCE, A/K/A LYLE D. NANCE,
DEFENDANT–RESPONDENT.

Argued January 7, 1997—Decided March 20, 1997.

378

*Raymond W. Hoffman*, Assistant Prosecutor, argued the cause for appellant (*Clifford J. Minor*, Essex County Prosecutor, attorney).

*Francis J. Hartman* argued the cause for respondent (*Hartman, Nugent & Zamost*, attorneys; *Deirdre K. Hartman*, on the briefs).

*Nancy A. Hulett*, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Peter G. Verniero*, Attorney General, attorney).

*David A. Ruhnke* argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (*Ruhnke & Barrett*, attorneys).

*Lyle D. Nance* submitted a supplemental brief, *pro se.*

The opinion of the Court was delivered by

COLEMAN, J.

The issue in this appeal is whether it was error to admit evidence of defendant's "other crimes, wrongs, or acts" against a third party in a purposeful or knowing murder trial to prove that the homicide was neither accidental nor in self-defense. The Appellate Division in an unpublished opinion concluded that it was reversible error to admit that evidence. We granted the State's

petition for certification, 145 *N.J.* 375, 678 *A.*2d 715 (1996), and now reverse.

# I

## -A-

Defendant was tried for the purposeful or knowing murder of Michael Snow, second-degree burglary of the apartment of Donnelle Williams, felony murder, two counts of endangering the welfare of children, and possession of a weapon for an unlawful purpose. A jury acquitted defendant of purposeful or knowing murder, but it found him guilty of a lesser-included offense of aggravated manslaughter. The jury also convicted defendant on the remaining charges. Defendant was sentenced on the felony murder to a custodial term of thirty years without parole eligibility, and two four-year terms with two years of parole ineligibility on the two endangerment charges, one term to be served consecutive and the other concurrent to the felony-murder and manslaughter terms. He was sentenced on the aggravated manslaughter to a concurrent custodial term of twenty-one years with seven years of parole ineligibility. The burglary and weapon offenses were merged with other convictions.

## -B-

During the trial defendant admitted shooting Michael Snow on September 5, 1992, but testified that the shooting was accidental. The State's theory was that defendant had shot Snow intentionally in a jealous rage related to Donnelle Williams.

Defendant, a corrections officer, and Williams began a romantic relationship in January 1992. The relationship ended after approximately six months when Williams learned that defendant had another girlfriend.

Williams resided in Newark and worked as a secretary at Irvington High School. She was the mother of three children, ages eleven, five, and seven months. Michael Snow was the

godfather of the children; he had never been romantically involved with Williams.

On the morning of the homicide, Snow went to Williams's apartment to visit her children after taking Williams to a laundromat. After watching television with the children for a brief period, Snow decided to leave at around noon. When he opened the door of the apartment, defendant was standing outside. The evidence is in dispute regarding what transpired thereafter.

Williams testified that she told defendant to leave, but that defendant forced his way into the apartment. Although defendant had previously met Snow, he angrily asked who he was. When defendant refused to leave, Williams asked her son to call the police, but defendant took the phone out of the child's hand. A short time later, Williams picked up a butter knife that was on top of her stereo. Defendant twisted the knife away from Williams, grabbed Snow's keys from an end table, and left the apartment. Snow followed defendant into the hallway outside Williams's apartment in an attempt to get his keys, but defendant refused to return them.

Defendant pulled his service revolver, a .357 Smith and Wesson magnum, from his holster. Williams tried to get between Snow and defendant, but she was pushed aside. A tussle ensued, during which defendant struck Snow two times in the side of his face with the gun. Snow tried to run back into the apartment, but defendant followed him. Snow tried to close the apartment door, but defendant had braced the door open with his foot and his arm that was holding the gun. Unable to close the door, Snow tried to keep defendant's arm with the gun in the air, but defendant pushed his way into the apartment, causing Snow to lose his balance and his grip on defendant's arm. As Snow tried to get up, defendant shot him in the chest.

Defendant's testimony was quite different. According to him, Snow approached him from behind as he was leaving the apartment and punched him in the left cheek, almost knocking him unconscious. Defendant testified that Snow punched him re-

peatedly, and that he told Snow to back off because he was a police officer. Defendant reached for his gun, hoping that Snow would stop his attack so that defendant could effectuate an arrest. Defendant testified that he struck Snow in the head with the gun when Snow tried to grab him. During the ensuing struggle, Snow grabbed defendant's arm and tried to point the gun at defendant's face. Defendant then placed his finger behind the trigger to prevent the gun from firing. When defendant moved away, Snow grabbed him and the gun accidentally discharged.

-C-

To prove that the killing was intentional rather than accidental, the State proceeded on the theory that defendant was jealous of Williams and that he had killed Snow in a jealous rage. The State offered Williams's testimony regarding defendant's conduct toward her to establish his jealousy. The trial court ruled that some bad-conduct evidence was admissible. However, the court ruled that the bad-conduct evidence should not include any acts of violence by defendant against Williams.

The first episode of bad conduct related to flowers that Williams received at work on Valentine's Day 1992. While Williams was on the phone with defendant, her co-worker told her that flowers had been delivered for her. Defendant apparently heard Williams's co-worker and asked Williams if she had received flowers. Williams replied that she had not received flowers because she was not sure whether the flowers in the office were for her. Williams eventually discovered that the flowers had been sent to her and her daughter, from her daughter's father. According to Williams, defendant came to her apartment that night and questioned her about the flowers. When Williams told defendant that the flowers were from her daughter's father, he became upset. Defendant grabbed the roses, tore them apart, and threw the remains in the garbage.

The second episode of bad conduct involved a black telephone book that contained the name "Robert." A few days after the

flowers incident, defendant confronted Williams with the telephone book and asked her who Robert was. Williams told defendant that the book did not belong to her, and that she did not know who Robert was. Defendant accused her of lying and became very upset.

The third episode occurred on May 9, 1992, when Williams received a "crank" telephone call. Williams testified that when she realized it was a crank call, she asked defendant to hang up the phone. Defendant demanded that she tell him who was on the phone. When Williams insisted that she did not know who the caller was, defendant grabbed the phone and tried to ascertain the caller's identity. After defendant hung up the telephone, he became angry, asking Williams who had called.

Following the crank call, Williams and defendant agreed to end their relationship for some time so that they could talk and resolve their problems. However, Williams and defendant resumed their relationship in June because defendant convinced Williams that things had gotten out of control because he had been under extreme pressure. The relationship resumed after defendant repeatedly apologized and promised not to have any further outbursts.

The fourth episode occurred in July 1992, when Lisa Owens, defendant's girlfriend, called Williams and told her that she was seven months pregnant with defendant's baby. When defendant came to Williams's apartment that evening, Williams told him that she had learned about Lisa Owens and that she wanted to be left alone. Williams left her apartment and went to her sister's house. When she returned with her sister and other members of her family, defendant was still in her apartment. A confrontation ensued between defendant and one of Williams's brothers. Williams told defendant that their relationship was over and asked him not to call her anymore.

On August 16, 1992, which was Williams's birthday, she met with defendant because he promised that he would leave her alone if she agreed to meet him. After that meeting, defendant persist-

ed in contacting Williams. Later in August, defendant followed Williams to her sister's house. When Williams stopped her car to get out, defendant took her keys. He later accused her of bringing another man, who turned out to be her son, home in her car earlier in August.

The Appellate Division held that the bad-conduct evidence was "fundamentally irrelevant to the issues [the] jury had to decide. There was no dispute that defendant killed Snow. The issue before the jury was whether the shooting was knowing or purposeful, as the State contended, or accidental, as Nance contended."

## II

### -A-

The State argues that the Appellate Division erred by concluding that defendant's relationship with Williams was irrelevant to the issue of whether the shooting was accidental or in self-defense. The State argues that the evidence clearly demonstrated that defendant's obsession with Williams and his jealousy motivated him to shoot Snow.

Defendant maintains that jealousy is not expressly included as one of the bases for which other-crime or other-conduct evidence can be admitted under *Rule of Evidence* 404(b). The Attorney General, as *amicus curiae*, agrees with the State's position. The Attorney General maintains that the Appellate Division's conclusion that the evidence complained of is irrelevant is erroneous because it is common for a defendant to interpose an accident defense in a homicide case involving the use of a firearm. The Attorney General urges that because the State had to prove that defendant possessed the mental state required for each offense charged beyond a reasonable doubt, the evidence was both probative and relevant to show defendant's motive and state of mind in an attempt to prove that the homicide was purposeful or knowing rather than accidental.

■ The Association of Criminal Defense Lawyers has also filed an *amicus curiae* brief, raising an issue that the State did not raise in its petition for certification. The Association asks the Court to adopt a rule requiring pretrial notice of an intention to introduce *Rule* 404(b) evidence. Because that issue was not raised by either of the parties, we have disregarded it. *Tice v. Cramer*, 133 *N.J.* 347, 355, 627 *A.*2d 1090 (1993).

-B-

The admission of other-conduct evidence in this case is controlled by *New Jersey Rule of Evidence* 404(b). That rule states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that he acted in conformity therewith. *Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.*

[*N.J.R.E.* 404(b) (emphasis added).]

That rule is the successor to *Evidence Rule* 55 which provided:

Subject to Rule 47, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed a crime or civil wrong on another specified occasion but, subject to Rule 48, such evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident.

[*Evid.R.* 55.]

■ A comparison of the language of the two rules reflects that *Rule* 404(b) is broader in scope than *Evidence Rule* 55 in circumscribing what evidence is inadmissible. *Rule* 404(b) excludes "[e]vidence of other crimes, wrongs, or acts" unless one of the exceptions applies. *Evidence Rule* 55, on the other hand, excludes only evidence of another "crime or civil wrong" unless one of the exceptions is involved. *Rule* 404(b), as did *Evidence Rule* 55, generally excludes evidence of other civil wrongs when offered for the purpose of showing a person's disposition to prove that the person acted in conformity therewith. Such evidence may not be admitted simply to reflect negatively on a defendant before a jury in a criminal case.

The exclusionary scope of *Rule* 404(b) is significant in this case because the trial judge determined that only bad acts or conduct toward Williams would be admissible at trial. He ruled that evidence of criminal conduct or civil wrongs toward Williams was inadmissible. Thus, if *Evidence Rule* 55 had been in effect at the time of the trial in the present case, the other-conduct evidence admitted would have fallen outside the scope of that rule. *See State v. Brown*, 138 *N.J.* 481, 534, 651 *A.*2d 19 (1994) (holding evidence that did not constitute either a criminal or civil wrong did not implicate *Evidence Rule* 55); *State v. Ribalta*, 277 *N.J.Super.* 277, 290–93, 649 *A.*2d 862 (App.Div.1994) (holding that handing large wad of currency to a known drug dealer was not excludable under *Evidence Rule* 55 because handing money to someone was not a crime), *certif. denied*, 139 *N.J.* 442, 655 *A.*2d 444 (1995); *State v. Porambo*, 226 *N.J.Super.* 416, 424–25, 544 *A.*2d 870 (App.Div.1988) (holding that because possession of a handgun is not in itself a crime, evidence that defendant had two loaded handguns may not be excluded under *Evidence Rule* 55).

■ Although the formulation and scope of the two rules are somewhat different, the principle behind both rules is the same: courts should exclude evidence of other crimes, civil wrongs, or acts enumerated in the respective rule when such evidence is offered solely to establish the forbidden inference of propensity or predisposition. *State v. Stevens*, 115 *N.J.* 289, 299, 558 *A.*2d 833 (1989); *State v. Kociolek*, 23 *N.J.* 400, 418–20, 129 *A.*2d 417 (1957). Because such evidence tends to be so prejudicial, *Rule* 404(b) and *Evidence Rule* 55 are viewed as rules of exclusion rather than rules of inclusion. *State v. Marrero*, 148 *N.J.* 469, —— – ——, 691 *A.*2d 293, —— – —— (1997); *State v. Cofield*, 127 *N.J.* 328, 337–38, 605 *A.*2d 230 (1992). Despite its prejudicial nature in some contexts, *Rule* 404(b) does not exclude evidence of other crimes, wrongs, or acts under all circumstances. The rule recognizes that there are times when that evidence is probative of a material disputed fact in the case. Even then, the risk of prejudice may outweigh the probative worth of the evidence. Because of this

tension, trial courts must conduct a balancing test pursuant to *New Jersey Rule of Evidence* 403 and then give the jury a proper limiting instruction. *N.J.R.E.* 105.

### III

Next, we focus on whether the other-conduct evidence offered by the State was properly admitted to establish defendant's motive or intent in killing Snow. As noted, the State contended that defendant purposefully or knowingly shot Snow because defendant was jealous over Williams's relationship with Snow. Defendant contended that the killing was accidental and in self-defense. Consequently, material factual issues regarding defendant's motive and intent, as well as the absence of an accident at the time of the killing, were in dispute.

 A four-part test has been established for determining when other-crime and civil-wrong evidence is admissible to avoid the misuse of that evidence. *Cofield, supra,* 127 *N.J.* at 338, 605 *A.*2d 230. We hold that the same test is to be applied to the admission of other-conduct evidence. The test is as follows:

1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[*Ibid.* (quoting Abraham P. Ordover, *Balancing The Presumptions Of Guilt And Innocence: Rules 404(b), 608(b), And 609(a),* 38 *Emory L.J.* 135, 160 (1989)).]

In *Marrero* we observed that:

Determinations on the admissibility of other-crime evidence are left to the discretion of the trial court: "The trial court, because of its intimate knowledge of the case, is in the best position to engage in this balancing process. Its decisions are entitled to deference and are to be reviewed under an abuse of discretion standard." *State v. Ramseur,* 106 *N.J.* 123, 266, 524 *A.*2d 188 (1987); *see also State v. DiFrisco,* 137 *N.J.* 434, 496, 645 *A.*2d 734 (1994) (noting that "[w]e accord trial judges broad discretion in applying the balancing test"), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996); *State v. Atkins,* 78 *N.J.* 454, 462, 396 *A.*2d 1122 (1979) (refusing to reverse admission of prior conviction where trial judge balanced probative value against potential for prejudice and noting that

"particularly in view of his feel of the case, we do not find [that the trial judge's] judgment constituted an abuse of the discretion vested in him"); *State v. Sands*, 76 *N.J.* 127, 144, 386 *A.2d* 378 (1978). Only where there is a "clear error of judgment" should the "trial court's conclusion with respect to that balancing test" be disturbed. *DiFrisco, supra*, 137 *N.J.* at 496–97, 645 *A.2d* 734; *see also State v. Koedatich*, 112 *N.J.* 225, 313, 548 *A.2d* 939 (1988) (noting that "[a] trial court's ruling will not be upset unless there has been an abuse of that discretion, *i.e.*, there has been a clear error of judgment"), *cert. denied*, 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.2d* 803 (1989).

[*Marrero, supra*, 148 *N.J.* at 483, 691 *A.2d* at 300.]

▪ Under the first prong of the *Cofield* test, defendant's motive, intent, and absence of an accidental shooting were relevant and disputed issues. Thus, Williams's testimony to establish jealousy was relevant and probative.

The State charged defendant with knowing or purposeful murder; therefore, the State had to negate the claim of an accident or self-defense to establish that crime. There was no other evidence available through which the State could establish motive because, while defendant conceded his involvement in the shooting, he claimed that it was accidental and in self-defense. By relying on those defenses, defendant "put[ ] his own state of mind in issue." *State v. Oliver*, 133 *N.J.* 141, 155, 627 *A.2d* 144 (1993). Thus, defendant's state of mind was a relevant issue, and the motive of jealousy was a proper basis upon which the jury could conclude that defendant *did or did not* intend to shoot Snow.

▪ Contrary to defendant's contention, jealousy need not be expressly enumerated in *Rule* 404(b) as one of the issues in a given case for which other-conduct evidence is admissible to establish its existence. *Rule* 404(b), as did *Evidence Rule* 55, represents the prevailing common-law rule throughout the United States. *Stevens, supra*, 115 *N.J.* at 299, 558 *A.2d* 833. "The examples set forth in the *Rule* ... are not intended to be exclusive." *Id.* at 300, 558 *A.2d* 833. Because of the non-exclusivity of the examples listed in *Rule* 404(b) and *Evidence Rule* 55, we conclude that other-conduct evidence may be admitted to prove jealousy when it is probative of a genuine issue in the case. *Ramseur, supra*, 106 *N.J.* at 267, 524 *A.2d* 188; *State v.*

*Breakiron,* 210 *N.J.Super.* 442, 460–61, 510 *A.2d* 80 (App.Div. 1986), *aff'd in part, rev'd in part on other grounds,* 108 *N.J.* 591, 532 *A.2d* 199 (1987). Here, it was probative of intent, motive, and the absence of an accident, all of which are enumerated exceptions to the rule.

We agree with the Attorney General's argument that, although Williams was not the victim of the homicide, defendant's jealousy toward her can establish a proper motive to explain why defendant acted the way he did against Snow, who had a good relationship with Williams. Indeed, in both *State v. Wright,* 66 *N.J.* 466, 332 *A.2d* 606 (1975), and *State v. Mulero,* 51 *N.J.* 224, 238 *A.2d* 682 (1968), this Court allowed evidence of abuse of a *third person* who was not the victim of the crime to be admitted to show motive or intent. In *Wright,* the Court found that the defendant's act of starving one child to near death was relevant to the issue of the defendant's wilful state of mind regarding the starvation death of a second child. *Wright, supra,* 66 *N.J.* at 468–69, 332 *A.2d* 606.

In *Mulero,* the Court held that the defendant's alleged physical abuse of his wife was admissible to establish intent in the trial of the defendant for allegedly murdering his stepdaughter. *Mulero, supra,* 51 *N.J.* at 228–29, 238 *A.2d* 682. The Appellate Division's attempt to distinguish *Mulero* from the facts in this case is unavailing. The court stated that unlike defendant in the present case, the defendant in *Mulero* denied administering the fatal beating. In both *Mulero* and the present case, the other-conduct evidence was offered not to establish that the defendant inflicted the mortal injuries, but rather to establish the defendant's state of mind at the time he inflicted the mortal wounds. Although defendant in this case concedes that he did the shooting, he claims that it was accidental or in self-defense. Therefore, he denies that this was a knowing or purposeful killing as charged in the indictment. The other-conduct evidence was offered to establish the motive for the shooting.

Similarly, the other-conduct evidence of defendant's jealousy satisfies the second and third prongs of the *Cofield* test. The

evidence that was presented through Williams's testimony was very recent because the conduct about which she testified had occurred within six or seven months of the killing, and her relationship with defendant lasted only six or seven months. In addition, if the jury believed Williams, her testimony constituted more than enough evidence for the jury to have found that her testimony clearly and convincingly established that jealousy was the motive for the shooting.

■ In compliance with the fourth prong of *Cofield*, the trial court weighed the evidence and determined that its probative value exceeded its prejudicial impact. Although this Court has maintained a high standard for admitting evidence of other crimes and civil wrongs, and that standard also applies to other-conduct evidence, the admission of other-conduct evidence should not be reversed unless " 'the danger of undue prejudice ... outweigh[s] probative value so as to divert jurors from a reasonable and fair evaluation of the basic issue of guilt or innocence.' " *Marrero, supra,* 148 *N.J.* at 490, 691 *A.*2d at 303 (quoting *State v. Moore,* 122 *N.J.* 420, 467, 585 *A.*2d 864 (1991)).

The trial court excluded certain evidence that the State would otherwise have introduced. The court also required, in effect, a redaction of some of the evidence to prevent placing before the jury evidence that the trial court regarded as too prejudicial. For example, when the State offered evidence of the fact that as a result of the telephone book incident, Williams tried to get a restraining order, and of the fact that defendant tried to strike her, the court ruled that that evidence was inadmissible. The trial court gave a curative instruction immediately when some of that evidence was mentioned. The court also precluded Williams from telling the jury about defendant stealing the telephone book from her apartment or defendant throwing the book at her. Nor was the State allowed to insinuate that defendant had restrained Williams or kidnapped her during that incident. We conclude that the trial court did not abuse its discretion by admitting the other-conduct evidence because it was not too prejudicial to defendant.

## IV

■ Although the Appellate Division did not reach the issue of the sufficiency of the limiting jury instruction because it reversed on other grounds, we have reviewed that instruction and conclude that it was sufficient.

■ When a trial court admits evidence of other conduct to show the defendant's motive, intent, or absence of an accident, "the court must instruct the jury on the limited use of the evidence." *Cofield, supra,* 127 *N.J.* at 340–41, ·605 *A.*2d 230. To satisfy that standard, a court's instruction must " 'be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence.' " *Id.* at 341, 605 *A.*2d 230 (quoting *Stevens, supra,* 115 *N.J.* at 304, 558 *A.*2d 833). In this case, the trial court instructed the jury as follows:

> This evidence was offered for a very limited and specific purpose. As I told you repeatedly during the course of the trial, evidence that a person committed a prior wrong on a specific occasion is inadmissible to prove his disposition to commit the crimes for which he has been indicted and for which he is presently being tried. In other words, *such evidence cannot be considered by you, must not be considered by you as disclosing any general propensity or predisposition on the part of the defendant to commit a crime or to commit these crimes for which he is now charged.* You may only consider the evidence in this case of alleged arguments, alleged theft of keys, taking—alleged taking of a phone book, alleged harassing telephone calls and visits, alleged trespass at work and threats allegedly committed by [defendant] against Donnelle Williams if you believe that they were, in fact made and done by [defendant] *solely to determine [defendant's] motive, his intent, his state of mind and the relationship between the parties and the effect on their credibility.* That is, whether these words and actions disclosed a hostility, a jealousy, a malice, an ill-will arising out of the relationship of [defendant], Donnelle Williams and in fact the victim of this offense. You may consider such evidence solely for this purpose, that is in determining a possible motive, intent, state of mind or relationship between Donnelle Williams and the defendant. You cannot, you must not consider it for any other purpose for what I have just indicated to you.

As the foregoing charge reflects, the jury was instructed on how it could and could not use the other-conduct evidence, assuming they believed it to be true. Its use was limited to deciding only defendant's motive, intent, and state of mind, as well as the credibility of the witnesses. The court instructed the jury not to

consider the other-conduct evidence for any other purpose. Finally, the court specifically prohibited the jury from using that evidence to infer that because of defendant's bad conduct toward Williams, he had a propensity or a predisposition to murder Snow. Furthermore, during their summations, all of the attorneys told the jury how to use the other-conduct evidence.

In addition to the thorough limiting instruction given at the end of the case, the trial court gave a limiting instruction following the introduction of each piece of other-conduct evidence. This is a case in which the risk of misuse was not nearly as great as in some cases that involve other-crime evidence. Most of the other-conduct evidence here did not portray defendant as a bad person.

## V

The Appellate Division reversed defendant's convictions on the ground that the trial court improperly admitted the other-conduct evidence. For that reason, the court did not decide whether alleged prosecutorial misconduct during the trial also required a new trial. Nor did the court decide all of the sentencing issues raised. We reverse the Appellate Division's decision vacating the convictions and ordering a new trial. We remand the matter to that court for consideration of the prosecutorial misconduct and sentencing issues.

Reversed and remanded.

*For reversal and remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.